AUSA JO[ ] LAUSCH (312) 886-4190

AO 91 (REV.5/85) Criminal Complaint

# UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

MAGISTRATE JUDGE NOLAN

UNITED STATES OF AMERICA          CRIMINAL COMPLAINT

v.

MICHAEL O'BOYLE, and
PEDRO SOTO

CASE NUMBER: 01CR1018

*FILED NOV 29 2001 MICHAEL W. DOBBINS CLERK, U.S. DISTRICT COURT*

*DOCKETED DEC - 5 2001*

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief. In <u>November 2001</u>, in <u>Cook</u> County, in the <u>Northern</u> District of <u>Illinois</u>, and elsewhere, defendants did conspire with each other and others to possess with intent to distribute and to distribute mixtures containing MDMA (3,4-methylenedioxymethamphetamine), a Schedule I drug controlled substance,

in violation of Title <u>21</u> United States Code, Section <u>846</u>. I further state that I am a <u>Special Agent, U.S. Customs Service,</u> and that this complaint is based on the
Official Title
following facts:

Please see attached affidavit.

Continued on the attached sheet and made a part hereof:  X Yes  ___ No

X _____
Signature of Complainant

Sworn to before me and subscribed in my presence,

November 29, 2001                           at  Chicago, IL
Date                                             City and State

NAN R. NOLAN, Magistrate Judge             _____
Name & Title of Judicial Officer                     Signature of Judicial Officer

State of Illinois    )
                     )
County of Cook       )

## AFFIDAVIT

I, John Coleman, being duly sworn, hereby depose and state as follows:

1. I am a Special Agent with the United States Customs Service, and have been so employed for approximately 11 years. I have been involved in numerous arrests and seizures involving narcotics investigations.

2. The information set forth in this affidavit is known to me through my personal knowledge, observation, investigation and through conversations with other federal, state and local officers, as well as other individuals involved in the investigation. Since this affidavit is being submitted for the limited purpose of establishing probable cause, I have not included each and every fact known to me concerning this investigation.

3. On November 26, 2001, four individuals attempting to enter the United States after flying from Amsterdam, Netherlands to Chicago O'Hare Airport were arrested in connection with their attempt to smuggle approximately 3,142 ecstasy pills (also known as MDMA or 3, 4 – methylenedioxymethamphetamine) into the country. These four individuals, named Kostantinos Koutelidakis, Anthony Sesso, Pamela Cottini, and Angela Zodda, arrived into Chicago O'Hare Airport on November 26, 2001 at approximately 1:15 pm via KLM Airlines Flight 611. Customs Inspectors observed the four individual separate from each other at the baggage carousel. Koutelidakis, Cottini, and Zodda approached the U.S. Customs primary checkpoint separately, while Sesso remained in the baggage claim area. Koutelidakis, Cottini, and Zodda were subsequently referred to U.S. Customs secondary, where Customs Inspectors

1

conducted separate examinations of each of them.

4. While Cottini's belongings were being searched, Customs Inspectors detected a foreign substance located in Cottini's cigarette pack. Before Customs Inspectors attempted to conduct a pat down search on her, Cottini asked to speak with Customs Inspectors. A Customs Inspector went to speak with Cottini, who at that point indicated that she had drugs in her crotch area. Several pills of suspected ecstasy were subsequently recovered from Cottini. Cottini subsequently stated that her friend, referring to Zodda, also had concealed drugs in the same area. In a separate room, a pat down search was conducted on Zodda, and several pills of suspected ecstasy were found in a pad inside Zodda's underwear as well as secreted in her crotch area. In all, approximately 3,142 pills of suspected ecstasy were recovered from Cottini and Zodda. As part of this investigation, agents conducted interviews of all four individuals after they waived their Miranda rights. Three of these individuals identified Pedro SOTO as the person who directed them to purchase the ecstasy pills in Amsterdam and smuggle the pills back into the United States, and who provided them with money and airline tickets to do so.

5. On November 26, 2001, Angela Zodda placed monitored telephone calls to SOTO, under the direction of U.S. Customs agents and task force officers, regarding the shipment of ecstasy pills seized at O'Hare. In one recorded telephone call, which was made at approximately 6:33 pm, SOTO scolded ZODDA for not calling him sooner about her location and the location of the ecstasy pills, saying, "In five hours Angie, don't you think that you should have called me?" SOTO and ZODDA continued to talk about the ecstasy pills that ZODDA had smuggled into the United States. In that regard, ZODDA said, "I don't know what they did to these bags, they cut me up, I'm bleeding, really bad. I don't even think they gave me, Dino gave

2

me the right amount." They continued talking about what ZODDA should do with the ecstasy pills:

| | |
|---|---|
| ZODDA | I'm going home, taking these pills out, okay? |
| SOTO | Meet me at my house, and we'll take them out at my house. |

\* \* \* \* \*

| | |
|---|---|
| SOTO | You, you guys didn't go anywhere after the airport. |
| ZODDA | We didn't go nowhere. |
| SOTO | So everything's still inside you, you say. |
| ZODDA | Everything's still inside me. |

In another telephone conversation at approximately 6:40 pm that same night, ZODDA and SOTO again talked about the ecstasy that was brought into the United States, in which SOTO expressed concern that KOUTELIDAKIS, who he had referred to as "Dino," was attempting to cause problems with the deal:

| | |
|---|---|
| SOTO | Did Dino try to pull any bullshit, yes or no? |
| ZODDA | You know what, I don't, I don't know, because he didn't give me the right amount. I know what we were supposed to have, I don't have that. |
| SOTO | What about a, what about a, Pammy? What's she got? |
| ZODDA | The same as me. How much was there supposed to be? |
| SOTO | Three, three all together. |

\* \* \* \* \*

| | |
|---|---|
| SOTO | What was, what was Dino doing? |
| ZODDA | When? |

3

| | |
|---|---|
| SOTO | Before you guys left. You guys stayed in the same room together, who counted everything out? |
| ZODDA | Him and Tony. |

SOTO ended the call by telling ZODDA that she and COTTINI, who he referred to as "Pammy," should go straight to SOTO's house.

6. After these and other calls were made between ZODDA and SOTO on November 26, 2001, SOTO was placed under arrest, he waived his Miranda rights, and he agreed to cooperate with law enforcement officers. At that time, SOTO identified Michael O'BOYLE as an individual who helped fund the smuggling operation and who SOTO was to provide with 1,000 of the smuggled ecstasy pills.

7. On November 26, 2001 and November 27, 2001, under the supervision of Customs agents and task force officers, SOTO had several consensually monitored telephone calls with O'BOYLE regarding the delivery of 1000 ecstasy pills that SOTO had obtained and was to deliver to O'BOYLE.

8. In a telephone call shortly after 11 pm on November 26, 2001, SOTO called O'BOYLE to tell him that the ecstasy had arrived, telling O'BOYLE that "that situation came through. . . . but the only thing is uh, that I'm not going to be able to hook that up, . . . you're going to have to do your own thing." SOTO continued, saying that he wanted to give O'BOYLE the ecstasy soon, because he didn't want to be "sittin' around with this stuff. I can't be sittin' dirty." O'BOYLE responded, "Yeah, alright, alright man. . . ." Later in that conversation, SOTO explained that he had two different kinds of ecstasy pills for O'BOYLE: "and I got them different kinds, too. I got the Red X's. I don't know if you seen those yet." SOTO and O'BOYLE then

4

agreed that the two of them would meet up the next day for the delivery of the ecstasy:

O'BOYLE  Okay, well, we'll meet up tomorrow.

SOTO  Which ones should I count though? You want the same old ones or you want the other ones, or what?

O'BOYLE  Yeah that's cool, as long as it's, as long as it's good.

SOTO  Well, which ones? (Unintelligible)

O'BOYLE  It doesn't matter.

SOTO  Okay.

O'BOYLE  They both, they both gotta be tight.

SOTO  I'll just put both of them in.

O'BOYLE  Alright.

9. In a telephone call at approximately 2:34 pm the next day, November 27, 2001, SOTO and O'BOYLE tried to arrange a time and place for SOTO to deliver the ecstasy to O'BOYLE. During that conversation O'BOYLE asked SOTO, "Did they mount wheels on those skates," which SOTO understood to mean that O'BOYLE wanted to know whether SOTO had the pills of ecstasy ready. SOTO responded to O'BOYLE that "everything is done, everything is good." O'BOYLE then engaged in further conversation about the two different types of ecstasy pills SOTO would be providing O'BOYLE:

SOTO  Everything is good though, I even split them up. I did it half and half.

O'BOYLE  You put the 280 wheels on the back and the 200 wheels on the front for speed. Alright, listen, when are you leaving . . .

Later in that conversation, O'BOYLE suggested that SOTO drop the ecstasy pills at his

grandparents' house, which is near SOTO's house. In a conversation only a minute or so later, O'BOYLE instructed SOTO to throw the ecstasy pills into O'BOYLE's grandparents' bushes: "Just go by my grandparents' house and throw it in the bush." At that time, SOTO and O'BOYLE did not agree to the delivery of the ecstasy pills by dropping them into the bushes outside O'BOYLE's grandparents' house.

10. In a later conversation at approximately 2:37 pm on November 27, 2001, SOTO complained that O'BOYLE had not yet picked up the ecstasy, saying "Every time you got me sitting dirty for ages because you get paranoid on your own you get me stuck being paranoid." O'BOYLE again told SOTO he could drop the ecstasy in a bush near O'BOYLE's grandparents' house, saying, "three blocks away is my grandparents house, you know what I mean." After SOTO said he could not make a drop there, SOTO and O'BOYLE agreed to talk later about when SOTO would give O'BOYLE the ecstasy.

11. At approximately 10:00 pm on November 28, 2001, SOTO placed a consensually monitored telephone call to O'BOYLE in order to arrange a location where SOTO could provide the ecstasy pills to O'BOYLE. During that call, O'BOYLE agreed to meet SOTO near SOTO's residence to conduct the ecstasy transaction. Customs agents conducting surveillance outside of the residence at 159 Schrieber Avenue in Roselle, Illinois, which SOTO had indicated as O'BOYLE's residence, saw three individuals leave the residence immediately following this telephone call between SOTO and O'BOYLE.

12. In additional recorded telephone conversations between SOTO and O'BOYLE after 10:00 pm on November 28, 2001, O'BOYLE indicated to SOTO that he did not come pick up the ecstasy pills from SOTO because he was concerned that either he or SOTO was being

6

followed by the police. O'BOYLE was later placed under arrest at his residence at 159 Schreiber Avenue in Roselle, Illinois.

13. Based on the above, there is probable cause to believe that defendants O'BOYLE and SOTO did knowingly and intentionally conspire with each other and others to possess with intent to distribute and distribute mixtures containing MDMA (3,4-methylenedioxymethamphetamine), a Schedule I narcotic drug controlled substance, in violation of 21 U.S.C. § 846

Further the affiant sayeth not,

John Coleman
Special Agent, U.S. Customs

SUBSCRIBED AND SWORN TO BEFORE ME
this 29th day of November, 2001

Nan R. Nolan,
U.S. Magistrate Judge